The CITY OF WICHITA FALLS, Texas and Wichita County Water Improvement District No. 2, Appellants,

v.

Wilmer G. GLEGHORN, Appellee.

No. 4808.

Court of Civil Appeals of Texas, Eastland.

Dec. 5, 1975.

Rehearing Denied Jan. 15, 1976.

Fillmore, Parish, Martin, Kramer & Fillmore, H. P. Hodge, Jr., City Atty., Wichita Falls, for appellants.

Joe H. Staley, Jr., Locke, Purnell, Boren, Laney & Neely, Dallas, D. J. Brookreson, II, Seymour, for appellee.

WALTER, Justice.

This is a condemnation suit. Wichita Falls, Texas and Wichita County Water Improvement District No. 2, hereafter referred to collectively as the City or appellants, filed suit against Wilmer G. Gleghorn to create a flowage easement over a portion of his land. Gleghorn recovered a judgment for $200,000 and the City and the Water District have appealed.

The City filed a motion to dismiss after the verdict was returned and it was overruled. We cannot agree with the City the court erred in refusing to permit them to dismiss. Article 3265, Vernon's Ann.Civ. Stat., and cases cited by appellants including *City of Rockwall v. Mitchell*, 497 S.W.2d 378 (Tex.Civ.App.—Waco 1973, writ ref. n. r. e.); and *Huntsville Independent School District v. Scott*, 483 S.W.2d 344 (Tex.Civ. App.—Houston (14th Dist.) 1972, 487 S.W.2d 692), authorize dismissal provided there has been no taking in the condemnation proceeding or under an agreement with the condemnee pending the proceedings.

A stipulation by the parties is as follows:

"The date of taking of the property by the Plaintiffs in this cause of action is January 21, 1974;

That the City of Wichita Falls and the Wichita County Water Improvement District No. 2, under the laws of the State of Texas and the Texas Constitution, have the right to condemn this property for the purposes set forth in their First Original Statement of Condemnation;

That the area of the part taken in this proceeding consists of 469.16 acres of land;

That the only remaining issues to be tried in this case are the damage issues, that all other matters in controversy have been admitted by the defendant."

Government regulations of the Corps of Engineers required that this property be obtained by the City. The dam at Lake Kemp was being raised and at the time of trial was not completed but the witness Fred Parky said it would be completed in a few days. The court in his findings of fact set forth in the judgment found the dam had been substantially completed at the time of trial.

In their statement of condemnation the City alleged:

"Plaintiffs further aver that since the spillway level of Lake Kemp is presently being raised from 1153.5 ft. m.s.l. to 1160 ft. m.s.l., the land area herein sought to be acquired between 1153.5 ft. m.s.l. and 1163 ft. m.s.l. will be used for the purpose of being submerged by water collected and impounded by the Lake Kemp storage dam, which is presently being raised as stated aforesaid, so that when the water in the Lake Kemp storage reservoir on the upstream side from said dam reaches the same elevation as the spillway level in said dam, to-wit, 1160 ft. m.s.l., the said land area herein sought is necessary to serve or partially serve as a precautionary measure against wave action, surge and backwater."

The manager of the district testified substantially as follows:

The City will have no control over letting the water in or letting it out insofar as the top ten feet of the dam is concerned. The top ten feet is known as the "flood control pool".

He was asked "are you taking it for the purpose of being submerged by water collected and impounded by the Lake Kemp Reservoir?", and he answered "Yes, that is the reason it is taken." "And doesn't this become a part of Lake Kemp?" And he answered, "It does".

In *Brazos R. Conservation & Reclamation Dist. v. Allen*, 171 S.W.2d 842, (Tex.1943), at pages 844, 845, the court said:

". . . A condemnor has the right to correct its errors, to dismiss its proceeding for condemnation, to abandon the purpose of taking the land, *but it may not exercise any of these rights to the prejudice of the land owner.* . . . It is true that it does not affirmatively appear from the record that respondents' land had actually been submerged by the waters of the reservoir when the District, on October 23, 1940, sought to dismiss the first suit and withdraw the deposit, but, as has been said, the dam at that time was practically completed and little, if

anything, remained to be done except closing the gates or openings in the dam and awaiting the accumulation of water to complete the actual taking of the land by inundation. Because of the practical completion of the dam, its magnitude, the purpose of the project and the location of respondents' land, the inundation of the land was at that time inevitable and imminent and the taking, to all intents and purposes, had been accomplished." (Emphasis added)

We hold the landowner would be prejudiced if the motion to dismiss were granted and there has been a taking of Gleghorn's property for all intents and purposes.

■ The Court gave the following instructions to the jury:

"You are instructed that the easement being taken by the City of Wichita Falls and the Wichita County Water Improvement District No. 2 from the Defendant between contours 1153.5 ft. m.s.l. up to and including contour lines 1163 ft. m.s.l. totals 469.16 acres and is to be used for the purpose of being submerged by water collected and impounded by the Lake Kemp storage dam which is presently being raised and it is also to serve or partially serve as a precautionary measure against wave action, surge, and backwater.

You are further instructed that the presumption is that the Wichita County Water Improvement District No. 2 and the city of Wichita Falls can exercise their rights and use of the 469.16 acres taken from the Defendant to the fullest extent of the rights acquired which are described in this charge, which rights include the right of being submerged by water."

Appellants objected to such instructions because they amounted to a comment on the weight of the evidence.

They rely on *City of Pearland v. Alexander*, 483 S.W.2d 244 (Tex.1972), wherein the court held the following instructions to be

erroneous as a comment on the weight of the evidence.

" 'You are instructed that the surface estate of the ten (10) acre tract of land condemned by the City of Pearland in this case and described as Tract One in the evidence before you will be used by the City of Pearland as a site for a sew[er]age disposal plant and you are to presume that the City of Pearland will exercise its rights and use and enjoy this properly to the full extent for such a sew[er]age disposal plant.' "

We hold *City of Pearland v. Alexander,* supra, is controlling and we sustain appellants' point that such instructions constituted a comment on the weight of the evidence.

Special issues number 3 and 4 and the jury's answers are as follows:

"SPECIAL ISSUE NO. 3

What do you find from the preponderance of the evidence was the market value of the Defendant's remaining tract of approximately 1130.84 acres of land, excluding the easement permanently over, across and upon the 469.16 acres on January 21, 1974, immediately before the 469.16 acres strip of land was condemned?

Answer by stating the amount in Dollars and Cents.

ANSWER: $282,710.00

SPECIAL ISSUE NO. 4

What do you find from a preponderance of the evidence was the market value of the remainder of Defendant's land on January 21, 1974, immediately after the other part was taken, giving consideration to the uses to which the part taken is to be subjected?

Answer by stating the amount in Dollars and Cents.

ANSWER: $141,355.00

In answering Special Issue No. 3 and Special Issue No. 4 you will take into consideration that a portion of the property in the remaining approximate 1130.84 acres of land is subject to a pre-existing easement to the Wichita County Water Improvement District No. 1."

On page 43 of appellants' brief, they say:

"The parties stipulated that the easement involved in the present case at bar covered from contour line 1153 to 1163 m.s.l. and contained 469.16 acres. The evidence revealed that the defendant's tract of land contained 1600 acres in all; that since 1922 there was a pre-existing flowage easement to contour line 1153 in almost the identical words; that this old easement covered 1,077 acres."

■ Appellants contend the court erred in failing to submit an issue on whether or not that portion of the remainder covered by the pre-existing easement suffered any additional damage. They also contend there was no evidence and insufficient evidence of any additional damage. We disagree.

Under these points of error, the appellants say:

"The writer can find no case in Texas jurisprudence where damages have been allowed for an additional easement or servitude to land covered by a pre-existing easement, whether rights under the proposed easements are no greater than the rights covered by the pre-existing easement."

However, they cite no cases holding to the contrary. They cite a quotation from Nichols on Eminent Domain.

In *State v. Hays,* 361 S.W.2d 401 (Tex. Civ.App.—Dallas 1962, writ ref. n. r. e.), at page 406, the court said:

"In their third point appellants complain because the court refused to give appellants' requested special Issue No. 1 as follows:

'From a preponderance of the evidence, what do you find was the market value of the land and improvements encumbered by an easement, condemned by the State of Texas and County of Dallas for highway purposes at the time it was condemned, considered separate property?'

The court did submit the following issue:

'From a preponderance of the evidence what do you find was the market value of the Defendants' property taken by the State of Texas for highway purposes at the time it was condemned on June 12, 1959, considered as separate property?'

The condemned property is subject to an easement. Appellees' witness Eastus testified about it. Appellees' witness McElya testified about it in great detail. Certainly, it was brought to the attention of the jury.

The issue submitted by the court was in the form approved in *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194. Though the issue as submitted did not expressly mention the easement it was all inclusive, so included the easement about which testimony had been received.

Appellants argue that the trial court apparently was of the opinion that there is something sacred about the *Carpenter* case. To negate such view they cite several cases which approve a departure from the language of the *Carpenter* case. *State v. Oakley*, Tex., 356 S.W.2d 909; *Holbrook et al. v. State of Texas*, Tex. Civ.App., 355 S.W.2d 235; *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808.

We have no quarrel with the holding in the above cases.

We certainly shall not hold that it is always wrong to depart from the forms of issues as set out in the *Carpenter* case. We do say that in the case now before us it was not wrong to adhere to the forms approved in the *Carpenter* case.

*Since the issue submitted was broad enough to include the easement in question, it was not error to refuse submission of the appellants' requested issue.*" (Emphasis added)

In 22 Tex.Jur.2d Eminent Domain § 156 (1961), it is stated:

". . . To enable the jury to determine the depreciation of the remainder, the parties have the right to introduce evidence of everything that would tend to affect the value of the land in the estimation of a proposed purchaser, or that would tend to make it more or less valuable to the present owner. In other words, all facts are relevant for consideration that tend to show that the remainder of the tract has been depreciated."

Gleghorn's value witnesses took in consideration the 1922 flowage easement before giving their opinions on the market value of the remainder.

The easement giving the City the right to flood up to 1163 ft. m.s.l. has increased the burden on the 1922 easement in that a greater quantity of water could be stored on the land covered by the old easement. Another significant matter that could reasonably be given consideration in negotiations by a willing seller and a willing buyer is the fact the Corps of Army Engineers have the absolute control over the top ten feet of the dam which they refer to as "the flood control pool". These factors would be considered by a willing buyer and a willing seller. This has been pointed out recently by our Supreme Court in *Spindor v. Lo-Vaca*, 529 S.W.2d 63 (1975), where they said:

"Article 3265, § 1, allows damages for diminution in value of the remainder to those which accrue 'by reason of the condemnation of the property, and its employment for the purpose for which it is to be condemned.' The factors to be considered are those which would reasonably be given consideration in negotiations between a willing seller and a willing buyer. *City of Pearland v. Alexander*, 483 S.W.2d 244 (Tex.1972); *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808 (1954). Since the damage to the lake was actually foreseen and hence clearly foreseeable, a hypothetical willing buyer-willing seller would take that factor into consideration in negotiating for the purchase of that property.

The expert's estimated cost to restore property is admissible in a condemnation trial to prove the probable diminution in fair market value of the remainder imme-

diately after the taking, regardless of whether any actual damage occurs. *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194 (1936). This estimate would go to the jury for their consideration in fixing the amount of foreseeable damages in the employment of the land for the purpose for which it was condemned."

In answering the issues on damages to the remainder, the trial court instructed the jury to take into consideration the pre-existing easement on a portion of the land. We hold the Court did not err in failing to submit an issue concerning the damages, if any, to that portion of the remainder covered by the 1922 easement.

■ The Court withdrew all the testimony of the City's appraiser witness J. B. Featherston, from the jury's consideration. Mr. Featherston qualified as a real estate appraiser with many years of experience. He was a member of the American Institution of Real Estate Appraisers. There is no dispute about his qualification as an appraiser.

Mr. Featherston testified as to his qualifications substantially as follows:

I have appraised ranch property in Montague, Knox and King counties. I have appraised the Waggoner Ranch which is located in Wilbarger, Montague, Knox, Hardeman, Baylor and Foard Counties. I have made a study of the rural land values for the entire county of Baylor. Since I made a study of the entire county of Baylor, I am aware of sales in this county of rural property. I have knowledge of the market value of the land located in this county. I was retained to appraise the fair market value of the Gleghorn property. I am familiar with the plaintiff's exhibit number 2. It is a map. ("This map was introduced into evidence without objection and shows the 1600 acres of land owned by Gleghorn and the land covered by the 1922 easement is colored in pink and the land covered by the easement sought in the present case is yellow and Mr. Gleghorn's remaining land is in green.")

I was asked to appraise the land covered in yellow, the area between 1153 and 1163. I was asked to appraise the area covered in green which represents the land which is above 1163 contour. I went to the Gleghorn property on two different occasions. On my first visit to this property I took some water samples and drove over the property with Mr. Fred Parky and Mr. Gleghorn. Mr. Gleghorn was not present when we took the water samples but he gave us permission. On my first visit I visited with Mr. Gleghorn. The next time I visited the property was on January 16th. I visited with Mr. Gleghorn and told him I wanted to make a complete inspection of his property and he informed us that his attorney had suggested that he go along. We traveled first to the headquarters and went through the river crossing on the west side. Mr. Gleghorn and I put on our waders and walked across to the top of this high ground. Mr. Gleghorn then described to me what he had done in breaking and clearing the brush and planting sorpham alom. We then drove over the east river crossing. We again put on our waders and crossed the river and went up to the area which was a high point. We went to a point where Mr. Gleghorn had his irrigation equipment stacked because he wanted to show it to me. I asked Mr. Gleghorn if there was anything else he wanted to show me and he said he believed we had pretty well seen the property.

In addition to walking on the property, I rented an airplane and flew around the general area of Mr. Gleghorn's property.

The City sought to show by Mr. Featherston's testimony the market value of the land taken by the easement and the severance damages to the remainder.

In the City's Bill of Exception Mr. Featherston testified substantially as follows:

I have read the Statement of Condemnation in this case and have analyzed it to the best of my ability. I do have an opinion as to the fair market value of the area within the easement as of January 21, 1974, after the imposition of the proposed easement. I would say the fair market value is $100 per acre. (He had testified the value of such property before the easement to be $112.50.) I do have an opinion as to the fair market value of the remaining property that is shown in green on plaintiff's exhibit # 2 as of January 21, 1974, immediately prior to the imposition of the easement. That value is $75 per acre. I do have an opinion as to the fair market value of the remainder immediately following the imposition of the easement and that value would be $75 per acre. The values I have expressed are in response to Mr. Fillmore's questions.

His questions were: First, as to the area in the yellow on the map which I understand would be the area between 1153 elevation and 1163, and I gave my opinion as to the value of this area before and after the imposition of the easement. The Second question related to the area shown in green which is the land that will remain above 1163 elevation and I was asked for my opinion as to the value of this particular acreage before and after the imposition of the easement.

Gleghorn objected to such testimony because:

"(1) that there was unity of use of the property and the whole unit must be appraised; (2) the witness' testimony as to the records of the U. S. Army Corps of Engineers on the probability of flooding is hearsay; and (3) that the witness' testimony was based on an improper assumption of occasional flooding."

At the time these objections were made, Featherston was using an improper basis for his opinion and the objection at that time was good. However, after giving the testimony referred to in Gleghorn's objection, Featherston read the statement of condemnation in this case and thereafter gave testimony based on the proper basis as to what rights were taken from and what rights were reserved by Gleghorn.

We hold the court committed reversible error in instructing the jury not to consider the testimony of Featherston because such testimony was relevant and material to the issues involved. Rule 372, T.R.C.P.

The judgment is reversed and the cause is remanded.

RALEIGH BROWN, Justice (concurring).

I concur in the reversal and remand of the cause.

McCLOUD, Chief Justice (dissenting).

I would affirm the judgment. The excluded testimony of the witness, J. D. Featherston, was merely cumulative. Appellants' witness, L. D. Jones, Jr., a qualified real estate appraiser, who was a member of the American Society of Appraisers, testified at length. He prepared a detailed map and aerial photographs of Gleghorn's property. He physically inspected the property, took numerous pictures, and prepared a soil analysis. He testified to comparable sales. Jones testified that in arriving at the fair market value, he took in consideration the probability of the type of flood it would take to inundate the easement. He stated he had been in Baylor County for fifty years and had never heard or been aware of the water being high enough to inundate Gleghorn's property. Jones said that would be a consideration in arriving at the fair market value of the property. Jones testified that the value of the 469.16 acres in the easement prior to the taking was $46,900 and after the taking was $42,201. The remainder of the property above 1163 ft. m.s.l. Jones valued at $23,300 before the taking and $22,135 after the taking.

Both Jones and Featherston recognized that Gleghorn owned 1600 acres and that all the land was being used as an economic unit, but each upon instructions from appel-

lants, appraised only those acres which were not burdened by the 1922 prior easement. They evaluated only the land above 1153 ft. m.s.l. Under the 1922 easement, which covered 1,077 acres, appellants had the right to store water on the 1,077 acres "when the water in the reservoir above said storage dam reaches the elevation of the level of the spillway in said dam."

Appellants' witness, Fred Parky, general manager of Wichita County Water Independent District No. 2, testified that water had never run over the old 1153 ft. m.s.l. spillway level. He stated that in 1950, during flood conditions, the water got within a foot or two of the spillway and almost got to the 1153 mark.

I do not think the excluded cumulative testimony of Featherston was reasonably calculated to and probably did cause the rendition of an improper judgment. Rule 434, T.R.C.P.

In my opinion the instructions given by the trial court did not constitute error.

The first paragraph of the instructions under attack merely tracks the language contained in the Statement for Condemnation and established the purposes for which the easement is taken and the rights acquired.

In the second paragraph the jury is instructed the presumption is that appellants, ". . . can exercise their rights and use of the 469.16 acres taken from the Defendant to the fullest extent of the rights acquired which are described in this charge, which rights include the right of being submerged by water." (emphasis added)

*City of Pearland*, supra, cited by the majority, is distinguishable. There the jury was instructed, ". . . to presume that the City of Pearland *will exercise its rights and use and enjoy this property to the full extent for such a sewerage disposal plant."* (emphasis added) The trial court had restricted the City from showing the actual uses of the ten acre site which at the time of the taking were reasonably foreseeable and probable. The City was contending, but not permitted to show, that the entire ten acres would not be covered by a plant. Our Supreme Court held:

". . . In our view, this instruction could only be understood by the jury as a mandate to presume a full use of the entire ten acres for an actual plant, rather than as a site for the plant and facilities that would be reasonably required; and as a further directive that in answering the market value issues the jury was to be governed by this presumption regardless of any evidence to the contrary, and whether or not such presumed use of the entire site for an actual plant was reasonably probable at the time of taking and would, or would not, be reflected in the market value of the remainder tract at such time. As such, the instruction was clearly erroneous as a comment on the weight of the evidence."

In the instant case the court permitted both appellants and defendant to show what each contended would be the reasonable and probable uses of the easement. Appellants' witnesses Parky and Jones, testified, in effect, that Gleghorn's property in all reasonable probability would never be submerged by water. Gleghorn and his appraisal witness, Heely, assumed appellants would use the easement to its fullest extent. The court instructed the jury that appellants could use the easement to its fullest extent. The jury was not instructed that appellants would so utilize the easement.

I do not think the instructions constituted an objectionable comment on the weight of the evidence. Rule 277, T.R.C.P., provides:

"The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers, but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers where it is properly a part of an explanatory instruction or definition."